# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CARITAS MEDICAL CENTER *et al.*, | : | |
| | : | |
| Plaintiffs, | : Civil Action No.: | 07-1889 (RMU) |
| | : | |
| v. | : Document Nos.: | 16, 21 |
| | : | |
| CHARLES E. JOHNSON, | : | |
| Acting Secretary, U.S. Department of | : | |
| Health and Human Services, | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| BAPTIST MEMORIAL HOSPITAL – | : | |
| MISSISSIPPI COUNTY, INC. *et al.*, | : | |
| | : | |
| Plaintiffs, | : Civil Action No.: | 07-2197 (RMU) |
| | : | |
| v. | : Document Nos.: | 14, 18 |
| | : | |
| CHARLES E. JOHNSON, | : | |
| Acting Secretary, U.S. Department of | : | |
| Health and Human Services, | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| CHIPPEWA VALLEY HOSPITAL & | : | |
| OAKVIEW CARE CENTER, INC. *et al.*, | : | |
| | : | |
| Plaintiffs, | : Civil Action No.: | 07-2329 (RMU) |
| | : | |
| v. | : Document Nos.: | 14, 18 |
| | : | |
| CHARLES E. JOHNSON, | : | |
| Acting Secretary, U.S. Department of | : | |
| Health and Human Services, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### DENYING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING THE DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter is before the court on the plaintiffs' motion for summary judgment and the defendant's cross-motion for summary judgment. The plaintiffs, a group of hospitals that receive funding through Medicare, complain that the defendant, the Acting Secretary of the Department of Health and Human Services ("the Department"),[1] erred by promulgating a rule regarding the rate at which some of their Medicare reimbursement rates were calculated from January 1, 1999 through July 31, 2000. In their motion for summary judgment, the plaintiffs request that the court invalidate the rule. The defendant has filed a cross-motion for summary judgment, maintaining that the court should uphold the rule. For the reasons discussed below, the court determines that the rule is entitled to deference. Accordingly, the court denies the plaintiffs' motion for summary judgment and grants the defendant's cross-motion for summary judgment.

## II. FACTUAL & PROCEDURAL BACKGROUND

This suit concerns the rate at which hospitals receive Medicare reimbursements for providing three specific types of outpatient services: ambulatory surgical, radiology and

---

[1] The original defendant to this action, Michael O. Leavitt, was the Secretary of the U.S. Department of Health and Human Services when this action was instituted. Pursuant to Federal Rule of Civil Procedure 25(d), the court has substituted the current Acting Secretary, Charles E. Johnson, for Mr. Leavitt as the defendant to this action. *See* FED. R. CIV. P. 25(d) (stating an "officer's successor is automatically substituted as a party" and that "[l]ater proceedings should be in the substituted party's name").

diagnostic services.[2]  Pls.' Mot. for Summ. J. ("Pls.' Mot.") at 6.  To provide context for the defendant's rule regarding the reimbursement rates for these three services, the court begins with a brief history of Medicare reimbursement methodologies.  At the inception of the Medicare program in 1965, all hospital services – both inpatient and outpatient – were reimbursed using the "reasonable cost" rate, which provides that the hospital is reimbursed for the actual costs that it incurred in furnishing the service.  *Id.* at 4; *see also County of L.A. v. Shalala*, 192 F.3d 1005, 1008 (D.C. Cir. 1999).  By the early 1980s, however, Congress had started to become dissatisfied with the reasonable cost rate, which it perceived as breeding "'little incentive for hospitals to keep costs down' because 'the more they spent, the more they were reimbursed.'"  *County of L.A.*, 192 F.3d at 1008.  In 1983, Congress created a "Prospective Payment System" ("PPS") for inpatient services.  Def.'s Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. ("Def.'s Cross-Mot.") at 4-5; *see also* 42 U.S.C. § 1395ww (applying the PPS to inpatient services).  Reimbursement under the PPS rate depends on the condition being treated rather than on the actual costs incurred.  Def.'s Cross-Mot. at 5.  While Congress applied the PPS to inpatient services in 1983, it continued to reimburse outpatient services using the reasonable cost rate.  *Id.*

In an effort to curb hospital outpatient costs, in the Omnibus Budget Reconciliation Act of 1986 ("the 1986 Act") Congress began applying a "blend rate"[3] to ambulatory surgical

---

[2]    The court will refer to ambulatory surgical, radiology and diagnostic services as the "three relevant services" throughout this Memorandum Opinion.

[3]    What the defendant refers to as the "blend rate," the plaintiffs call the "blended payment rate limits," reiterating that the amount hospitals are reimbursed is limited by this methodology.  Pls.' Reply in Support of Mot. for Summ. J. & Opp'n to Def.'s Cross-Mot. for Summ. J. ("Pls.' Reply") at 14 n.3.  The court acknowledges the plaintiffs' point but, for simplicity, refers to this methodology as the "blend rate."

procedures.  Pub. L. No. 99-509, 100 Stat. 1874 (codified as amended at 42 U.S.C. §

1395*l*(i)(3)).  The "blend rate" is a hybrid between the reasonable cost formula and the PPS

formula.  Def.'s Cross-Mot. at 6.  In regulations concerning the blend rate, the Department

explained that the rate was a temporary payment method that would be used until a PPS for

ambulatory surgical procedures could be developed.  52 Fed. Reg. 36,767 (Oct. 1, 1987).  In

1988, Congress then applied the blend rate to radiology and other diagnostic services.  Pub. L.

No. 100-203, 101 Stat. 1330 (codified as amended at 42 U.S.C. § 1395*l*(a)(2)(E)).  Meanwhile,

Congress continued to work toward developing a PPS for outpatient services, and in the

Balanced Budget Act of 1997 ("BBA") it announced that a PPS for outpatient services would go

into effect beginning on January 1, 1999.  Pub. L. No. 105-33, 111 Stat. 251.  To be consistent

with this enactment, Congress added a "conforming amendment" establishing that both the blend

rate and the reasonable cost rate, which was still being applied to other types of outpatient

services, would sunset when the PPS went into effect on January 1, 1999.  *Id.*; *see also* 42 U.S.C.

§ 1395*l*(t) (codifying conforming amendments).

    The plan went awry, however, when the Department realized that Medicare was at risk of

a "total systems failure" if the Department did not quickly correct a computer programming

defect that made its computers unable to distinguish between the years 1900 and 2000 ("the Y2K

crisis").  Def.'s Cross-Mot. at 11.  The Department rearranged its priorities and postponed

implementing the PPS until after the Y2K crisis was averted.  *Id.*  Congress ratified this decision

in the Balanced Budget Refinement Act of 1999 ("the 1999 Act").  Pub. L. No. 106-113, 113

Stat. 1501.  In the 1999 Act, Congress did not extend the sunset dates for the blend rate and the

reasonable cost rate beyond January 1, 1999.  *Id.*; *see also* Pls.' Mot. at 8.  In other words,

Congress did not address what reimbursement method would apply to the three relevant services between January 1, 1999 and when the PPS was finally implemented. Pls.' Mot. at 8. Congress did, however, extend a provision establishing "reasonable cost reduction factors": factors that affect the calculation of the reasonable cost rate. Pub. L. No. 106-113, 113 Stat. 1501; *see also* Pls.' Mot. at 8.

On April 7, 2000, the defendant promulgated a rule establishing that the PPS would go into effect later that year. 65 Fed. Reg. 18,489-90. The rule also established that for the interval between January 1, 1999 and the date the PPS went into effect, the blend rate would continue to be applied to the three relevant services. *Id.* On August 1, 2000, the PPS finally went into effect. 65 Fed. Reg. 40535. The plaintiffs object to the portion of the rule that applied the blend rate to the three relevant services from January 1, 1999 through July 31, 2000. Pls.' Mot. at 14. The plaintiffs have moved for summary judgment, contending that they are entitled to be reimbursed at the reasonable cost rate rather than at the blend rate. *Id.* at 1. The defendant, on the other hand, has opposed the plaintiffs' motion for summary judgment and filed a cross-motion for summary judgment, asserting that he properly applied the blend rate. Def.'s Cross-Mot. at 1. The court turns now to the parties' arguments.


### III.  ANALYSIS

### A.  Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are

"material," a court must look to the substantive law on which each claim rests.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" is one whose resolution could

establish an element of a claim or defense and, therefore, affect the outcome of the action.

*Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable

inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

*Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere

existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion

for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make

a showing sufficient to establish the existence of an element essential to that party's case."

*Celotex*, 477 U.S. at 322.  By pointing to the absence of evidence proffered by the nonmoving

party, a moving party may succeed on summary judgment.  *Id.*

The nonmoving party may defeat summary judgment through factual representations

made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v.*

*Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir.

1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338

(D.C. Cir. 2006).

**B.  Legal Standard for Judicial Review of Agency Interpretations of Statutes**

The Supreme Court set forth a two-step approach to determine whether an agency's

interpretation of a statute is valid under the APA.  *Chevron, U.S.A., Inc. v. Natural Res. Def.*

*Council, Inc.*, 467 U.S. 837 (1984).  This approach, commonly referred to as "*Chevron* deference," requires the court to first look to "whether Congress has spoken to the precise question at issue."  *Id.* at 842.  If so, the court ends its inquiry.  *Id.*  But, if the statute is ambiguous or silent, the second step requires the court to defer to the agency's position, so long as it is reasonable.  *Id.* at 843; *Sea-Land Servs., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C. Cir. 1998) (holding that "[*Chevron*] deference comes into play of course, only as a consequence of statutory ambiguity, and then only if the reviewing court finds an implicit delegation of authority to the agency").  In applying *Chevron*, the Supreme Court has held that "[a]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).  Indeed, "judgment about the best regulatory tools to employ in a particular situation is . . . entitled to considerable deference from the generalist judiciary."  *W. Union Int'l, Inc. v. Fed. Commc'ns Comm'n*, 804 F.2d 1280, 1292 (D.C. Cir. 1986).

### C.  The Court Denies the Plaintiffs' Motion for Summary Judgment and Grants the Defendant's Cross-Motion for Summary Judgment

The plaintiffs claim the defendant erred by promulgating a rule applying the blend rate to the calculation of payments for the three relevant services from January 1, 1999 through July 31, 2000.  Pls.' Mot. at 1.  This claim is based on four rationales, each of which the plaintiffs contend independently invalidates the rule.  *Id.* at 2-3.  First, the plaintiffs argue that the rule violates plain statutory language and legislative intent.  *Id.* at 2.  More specifically, the plaintiffs

claim that the rule violates the plain text of the BBA because the BBA "expressly terminated [application of the blend rate to the three relevant services] effective January 1, 1999." *Id.* at 14. The plaintiffs further assert that application of the blend rate violates clear legislative intent because Congress intended to impose the reasonable cost rate, not the blend rate, for the three relevant services. *Id.* at 15-20.

To arrive at this conclusion, the plaintiffs focus on the 1999 Act, in which Congress extended application of the cost reduction factors. *Id.* at 16. Invoking the statutory canon *expressio unius est exclusio alterius*,[4] the plaintiffs contend that by extending application of the cost reduction factors but not the blend rate, Congress expressed its intent to preclude application of the blend rate to the services at issue. *Id.* at 16-18. And because the cost reduction factors apply solely to the reasonable cost rate, Congress must have intended to extend application of the reasonable cost rate when it extended the cost reduction factors. *Id.* at 18. Likewise, the plaintiffs point out that Congress historically applied the reasonable cost rate to the three relevant services; in their view, this bolsters their assertion that Congress intended for the reasonable cost rate to be applied from January 1, 1999 through July 31, 2000. *Id.* at 19.[5]

---

[4]    The canon *expressio unius est exclusio alterius* dictates that "explicit direction for something in one provision, and its absence in a parallel provision, implies an intent to negate it in the second context." *Cheney R. Co. v. Interstate Commerce Comm'n*, 902 F.2d 66, 68 (D.C. Cir. 1990) (quoting *Clinchfield Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 895 F.2d 773, 779 (D.C. Cir. 1990)).

[5]    The plaintiffs make one additional argument to support their contention that application of the blend rate to the three relevant services is inconsistent with legislative intent: they assert that the blend rate violates the "prohibition on cross-subsidization," a canon specific to Medicare. Pls.' Mot. at 19-20. The defendant correctly observes that the plaintiffs failed to raise this argument during the notice and comment period, Def.'s Cross-Mot. at 27, a point the plaintiffs do not contest, *see generally* Pls.' Reply. Because "[i]t is well established that issues not raised in comments before the agency are waived," the court will not consider this argument. *Nat'l Wildlife Fed. v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002).

The plaintiffs next offer a second argument as an alternative to the first: they assert that even if the court determines that construing the BBA literally would plainly be inconsistent with legislative intent, the court should still invalidate the rule. *Id.* at 20-26. In making this argument, the plaintiffs acknowledge that it is possible to interpret the BBA as creating a gap in Medicare payments for the three relevant services from January 1, 1999 through July 31, 2000. *Id.* at 20-21. The parties agree that this plain reading of the statute – which would result in the plaintiffs being entitled to no Medicare payments at all – would be inconsistent with legislative intent. *Id.* at 21. If construing a statute literally would produce an absurd result, the agency is entitled to enact a rule that violates the plain language of the statute, but the agency must modify the plain language no more than necessary to effectuate legislative intent. *Id.* at 22. The plaintiffs point out that in such situations, the agency's decision is not entitled to *Chevron* deference. *Id.*

In the instant case, the plaintiffs declare, the rule applying the blend rate to the three relevant services modified the statute more than necessary because the minimum deviation from the plain language of the statute would have been to apply the reasonable cost rate rather than the blend rate. *Id.* at 23-26. The reasoning that the plaintiffs use to support this contention echoes their first argument, discussed above, in which they maintain that the application of the blend rate to the services at issue violates legislative intent. *See id.* at 15-20. The plaintiffs again submit that Congress must have intended to apply the reasonable cost rate because it extended the cost reduction factors, which apply only to the reasonable cost rate, in the 1999 Act. *Id.* at 24. And the plaintiffs repeat their assertion that the application of the blend rate to the three relevant services from January 1, 1999 through July 31, 2000 conflicted with Congress's aim to sunset the blend rate beginning on January 1, 1999. *Id.* at 25.

The plaintiffs' third argument in favor of invalidating the rule is that the rule is arbitrary and capricious because it fails to provide a reasoned explanation for treating the three relevant services differently from other outpatient services. *Id.* at 26-28. The plaintiffs, however, failed to raise this objection during the notice and comment period.[6] Because "issues not raised in comments before the agency are waived," the court will not consider this argument. *Nat'l Wildlife Fed. v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002). Fourth, and finally, the plaintiffs contend that the rule is impermissibly retroactive. Pls.' Mot. at 28-30. More specifically, although the rule applied to the three relevant services furnished beginning on January 1, 1999, the agency did not promulgate it until April 7, 2000. *Id.*

The defendant's portrayal of the case differs sharply from the plaintiffs'. He first contests the plaintiffs' assertion that the rule violates the statute's plain language because the BBA expressly terminated application of the blend rate effective January 1, 1999. *See* Pls.' Mot. at 14-15. In the defendant's view, because Congress envisioned that the blend rate would sunset and be replaced by the PPS on January 1, 1999, it is merely silent as to what payment method applied to the services in question from January 1, 1999 through July 31, 2000. Def.'s Cross-Mot. at 19-22. This distinction is pivotal because when Congress is silent or leaves a gap for the agency to fill, as the defendant maintains Congress did here, it presents a quintessential case calling for *Chevron* deference. *Id.*

The defendant also observes that the BBA provided for the sunset not only of the blend

---

[6]     The plaintiffs did not address the defendant's contention, Def.'s Cross-Mot. at 31, that the plaintiffs waived this argument by failing to raise it during the notice and comment period, *see generally* Pls.' Reply. The court deems the plaintiffs to have conceded this point. *See Twelve John Does v. District of Columbia*, 117 F.3d 571, 577 (D.C. Cir. 1997) (noting that arguments not addressed are treated as conceded).

rate, but also of the reasonable cost rate effective January 1, 1999. *Id.* at 24-25. Therefore, if extending the blend rate through July 31, 2000 violated the plain language of the BBA, then extending the reasonable cost rate would also have violated the statute. *Id.* at 25. And in a related argument, the defendant disputes the plaintiffs' contention that Congress expressed its preference for the reasonable cost rate by extending the cost reduction factors, which the plaintiffs maintain apply solely to the reasonable cost rate. *Id.* at 25-26. First, the defendant counters the plaintiffs' assertion that the cost reduction factors apply only to the reasonable cost rate by pointing out that the reasonable cost is part of the blend rate calculus. *Id.* at 26. In any event, the defendant avers that had Congress intended to extend the reasonable cost rate, it would have done so explicitly, rather than merely implying its intent to extend the reasonable cost rate by extending application of the cost reduction factors.[7] *Id.*

The defendant then takes aim at the plaintiffs' central argument, namely that the rule extending application of the blend rate violated clear legislative intent because the BBA established that the blend rate would sunset on January 1, 1999. *See* Pls.' Mot. at 14-20. From the defendant's point of view, Congress did not intend to terminate the existing payment methods before the PPS was implemented. Def.'s Cross-Mot. at 22-24. Rather, the provision setting January 1, 1999 as the sunset date for the blend rate was expressly denoted as a mere "conforming amendment" appended to the section authorizing the enactment of the PPS. *Id.* at 23. The defendant asserts, in other words, that the sunset provision demonstrated Congress's intent to seamlessly replace the blend rate with the PPS, as opposed to proving, as the plaintiffs

---

[7]     The plaintiffs respond to this argument in their reply by surmising that Congress meant to expressly extend application of the reasonable cost rate, but inadvertently failed to as the result of a "drafting error." Pls.' Reply at 13.

allege, that Congress intended to terminate the blend rate even if the PPS did not go into effect as planned. *Id.* Had Congress intended to reverse its decade-long trend away from cost-based reimbursement and return to the reasonable cost rate, it would have demonstrated that intent much more clearly than in a "conforming amendment." *Id.*

The defendant next addresses the plaintiffs' assertions that the rule is not entitled to *Chevron* deference and that it erroneously modifies the plain language of the BBA more than necessary. *See* Pls.' Mot. at 20. The defendant argues that the court need not determine what constitutes the minimum deviation from the statutory language because the rule that the plaintiffs cite as requiring that analysis is inapplicable here. Def.'s Cross-Mot. at 18. More specifically, the defendant agrees with the plaintiffs that the fact that Congress failed to articulate what payment method would apply if the PPS did not go into effect on January 1, 1999 creates a "statutory anomaly." *Id.* But in the defendant's view, Congress's silence on this point gives rise to the principle that when there are two ways of avoiding a statutory anomaly, both of which are equally consistent with the statutory text and legislative intent, the agency's choice between the two equally plausible alternatives is entitled to *Chevron* deference. *Id.* at 18-19.

In the alternative, the defendant argues that the court should uphold the rule even if it deems the "minimum deviation" test pertinent here because applying the blend rate to the three services in question from January 1, 1999 through July 31, 2000 constituted the minimum possible deviation from the plain language of the statute. *Id.* at 29-31. This assertion is based on the defendant's view, discussed above, that Congress intended to continue to apply the blend rate until the PPS went into effect. *Id.* at 29. Therefore, to have applied the reasonable cost rate rather than the blend rate to the interval in question would have marked a departure from clear

12

congressional intent.  *Id.*

Based on his reasoning, the defendant also contests the plaintiffs' final argument, namely, that the rule was impermissibly retroactive.  *See* Pls.' Mot. at 28-30.  Observing that an agency rule is impermissibly retroactive only if it attaches new legal consequences or deprives the plaintiff of a preexisting right, the defendant states that the rule applying the blend rate to the three relevant services from January 1, 1999 through July 31, 2000 merely maintained the status quo because the blend rate had been in effect prior to January 1, 1999.  Def.'s Cross-Mot. at 33-34.  Therefore, although the rule was enacted after January 1, 1999, it is not impermissibly retroactive.  *Id.*  In contrast, applying the reasonable cost rate beginning on January 1, 1999 would have changed the status quo, and therefore would have been impermissibly retroactive. *Id.*  The plaintiffs fail to respond directly to this argument, and instead recapitulate their assertion that the rule was retroactive because it was enacted after January 1, 1999.  Pls.' Reply in Support of Mot. for Summ. J. & Opp'n to Def.'s Cross-Mot. for Summ. J. ("Pls.' Reply") at 27-28.

The plaintiffs raise two additional arguments in their opposition to the defendant's cross-motion for summary judgment and reply in support of their motion for summary judgment.  First, after addressing some of the points raised in the defendant's cross-motion for summary judgment, they declare that "[t]he remainder of the arguments" raised by the defendant "warrant no attention" because they do not reflect the considered judgment of the defendant at the time the rule was promulgated, and instead constitute mere "post-hoc rationalizations of litigation counsel."  *Id.* at 24-25.  The defendant counters that the rationale for his position is articulated clearly in the rule and that his position in this litigation "is precisely the position" that he took in promulgating the rule.  Def.'s Reply in Support of Cross-Mot. ("Def.'s Reply") at 14-15.

13

Second, the plaintiffs assert that the rule is arbitrary and capricious because the defendant failed to acknowledge the comments submitted in favor of the plaintiffs' position when he promulgated the rule.  Pls.' Reply at 20-24.  In response, the defendant notes that only nine out of the 10,500 comments submitted during the notice and comment period supported the plaintiffs' position and avers that the final rule "implicit[ly] reject[ed]" those comments.  Def.'s Reply at 16-17. Because an agency need only state the central reasons for its decision, the enactment of the rule was not procedurally deficient.  *Id.*

For the reasons discussed below, the court defers to the defendant's decision to apply the blend rate to the three services in question from January 1, 1999 through July 31, 2000.  As an initial matter, the court determines that the plain text of the BBA is silent as to what payment method would apply from January 1, 1999 through July 31, 2000 in the event the PPS was not implemented on January 1, 1999.  42 U.S.C. §§ 1395*l*(a)(2)(B), 1395*l*(t)(1)(A).  Although the plaintiffs contend that the BBA expressly terminated the blend rate effective January 1, 1999, Pls.' Mot. at 15, they draw this conclusion solely from the "conforming amendments" section of the BBA, which establishes that the blend rate applies to "services . . . furnished before January 1, 1999," 42 U.S.C. § 1395*l*(a)(2)(B).  Plainly, the provision to which this amendment was meant to "conform" was the new subsection of the BBA, which established that the PPS rate would apply to "services . . . furnished during a year beginning with 1999."  42 U.S.C. § 1395*l*(t)(1)(A). To interpret the conforming amendment as unambiguously providing for the termination of the blend rate regardless of whether the PPS was implemented on January 1, 1999 would place more weight on the amendment than it can reasonably bear.  *See Springdale Mem. Hosp. Ass'n, Inc. v. Bowen*, 818 F.2d 1377, 1386 (8th Cir. 1987) (citing *CBS, Inc. v. FCC*, 453 U.S. 367, 381-81

14

(1981) (holding that nothing in the legislative history indicated that Congress intended a mere conforming amendment to have the "radical effect" of changing Congress's approach with respect to Medicare payments). When the PPS was not implemented on January 1, 1999 as planned, it created a gap as to what payment method applied, and the defendant properly promulgated a rule to fill that gap. *Cf. Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (holding that because Congress had spoken to the precise question at issue, there was no gap for the agency to fill).

Thus, the court proceeds to the second step of the *Chevron* test. *Chevron*, 467 U.S. at 843. The court's task is to determine whether the defendant's decision as to what payment method applied between January 1, 1999 and July 31, 2000 was reasonable; if it was, the court must defer to it. *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 468 (D.C. Cir. 2005) (quoting *Chevron*, 467 U.S. at 845). To determine whether the rule interpreting the statute was reasonable, the court examines the defendant's justification for his construction of the statute. *See, e.g.*, *S. Co. Servs., Inc. v. FCC*, 313 F.3d 574, 580-81 (D.C. Cir. 2002) (analyzing the agency's reasoning concerning what interpretation would best effectuate legislative intent). The defendant notes that the Department had applied the blend rate to the three relevant services for over a decade prior to 1999; therefore, he decided that "continuing the use of existing methodologies until the PPS could take their place" would effectuate Congress's intent to have a seamless transition between the existing methodologies and the PPS. Def.'s Cross-Mot. at 19. The court determines not only that this was a reasonable decision, but that it was the decision that best effectuated Congress's intent. In contrast, the plaintiffs have failed to persuade the court that it would be reasonable for the defendant to infer that Congress intended to reverse course by departing from the blend rate

and returning to the reasonable cost rate before the PPS was implemented.  The thin reed on which the plaintiffs' argument rests – that Congress implied its preference for the reasonable cost rate by extending the cost reduction factors after it discovered that the PPS would not go into effect on January 1, 1999 – collapses under the weight of the deference to which the defendant is entitled.  *See W. Union Int'l*, 804 F.2d at 1292 (emphasizing that agency determinations are entitled to "considerable deference").  Accordingly, the court defers to the decision to apply the blend rate to the services in question from January 1, 1999 through July 31, 2000.

In making this determination, the court rejects the plaintiffs' contention that the rule had an impermissible retroactive effect.  A rule is impermissibly retroactive only if it "attaches new legal consequences to events completed before its enactment."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994).  To determine whether a rule falls into this category, the court must take into account "familiar considerations of fair notice, reasonable reliance, and settled expectations."  *Id.*  Here, the plaintiffs do not attempt to persuade the court that the decision to continue applying the blend rate to the three relevant services from January 1, 1999 through July 31, 2000 disturbed hospitals' settled expectations.  *See generally* Pls.' Reply.  Nor could they, for the blend rate had been in effect with respect to those services for over ten years prior to 1999.  42 U.S.C. § 1395*l*(i)(3); 42 U.S.C. § 1395*l*(a)(2)(E).  Accordingly, the court holds that the rule did not have an impermissibly retroactive effect.  *Landgraf*, 511 U.S. at 270.

Finally, the court addresses the plaintiffs' assertion that the enactment of the rule was procedurally deficient.  The plaintiffs allege that the defendant's justifications of the rule are merely "post-hoc rationalizations" not raised when the rule was promulgated.  *See* Pls.' Reply at 23-24.  The court rejects this allegation.  While the defendant's arguments in this litigation

expand on the points raised in the text of the final rule, his position has not changed.  *See* 65 Fed. Reg. 18,489-90 (Apr. 7, 2000).

In addition, the plaintiffs claim the rule is arbitrary and capricious because the defendant failed to acknowledge the comments submitted in support of the plaintiffs' position during the notice and comment period.  *See* Pls.' Reply at 20-24.  But the plaintiffs misconstrue the defendant's duty to respond to comments received.  An agency need not respond to or explicitly discuss every comment received "so long as it responds in a reasoned manner to significant comments received" or explains the rule in a way that implicitly rejects significant comments received.  *U.S. Satellite Broad. Co., Inc. v. Fed. Commc'ns Comm'n*, 740 F.2d 1177, 1188 (D.C. Cir. 1984).  Here, although the defendant did not respond explicitly to the nine comments submitted in favor of the plaintiffs' position (out of more than 10,000 comments received in total), he did respond in a reasoned manner to the central concerns raised during the notice and comment period.  *See* 65 Fed. Reg. 18,489-90 (Apr. 7, 2000).  Moreover, by explaining that he believed Congress intended to continue to apply the blend rate until the PPS was implemented, the defendant implicitly rejected the plaintiffs' competing proposition, that Congress intended to apply the reasonable cost rate after January 1, 1999 and before the PPS was implemented.  *See* 65 Fed. Reg. 18,490 (Apr. 7, 2000) (concluding that given the fact that the Y2K crisis delayed implementation of the PPS, "the most appropriate reading" of the BBA was that "it authorizes the Secretary to continue to [apply the blend rate] until PPS can be implemented.  If the Congress had known about the Y2K problem at the time it enacted the PPS statute, this is the only rational approach it could have adopted.")  As a result, the court rejects the plaintiffs' claim that the rule was arbitrary and capricious and holds that the defendant properly applied the blend rate to the

17

three services in question from January 1, 1999 through July 31, 2000.

## IV.  CONCLUSION

For the foregoing reasons, the court denies the plaintiffs' motion for summary judgment

and grants the defendant's cross-motion for summary judgment.  An Order consistent with this

Memorandum Opinion is separately and contemporaneously issued this 26th day of March, 2009.


RICARDO M. URBINA
United States District Judge